UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | Criminal No. 19-20 |
| | * | |
| VERSUS | * | Section: "R" |
| | * | |
| WAYNE TRICHE | * | |
| | * | |
| | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COUNTS 1 – 34 OF THE INDICTMENT
### FOR FAILURE TO STATE AN OFFENSE

**NOW INTO COURT,** through undersigned counsel, comes Defendant Wayne Triche, who pursuant to Fed. R. Crim. P. 12(b)(3)(B) respectfully moves this Honorable Court to dismiss the thirty-four (34) counts of wire fraud set forth in Counts 1 through 34 of the Indictment ("the Wire Fraud Counts") for failure to state an offense and submits this memorandum in support thereof. *See* Indictment at pp. 4-6, ECF No. 1. As set forth below, the Indictment fails to support the essential elements of the wire fraud charges against Mr. Triche. Accordingly, the Wire Fraud Counts should be dismissed.

**I.   FACTUAL BACKGROUND**

**A. General**

George Russell ("Russell"), is the person identified in the indictment as "G.R." Wayne Triche was introduced to Russell around 2001 or 2002 when Russell approached Triche and Associates, L.L.C. ("TA") a certified public accounting firm, and engaged Wayne Triche, C.P.A. to assist Russell in connection with the filing of tax returns. Later in this professional relationship,

1

during 2002, Russell asked Triche to file with the Secretary of State papers establishing American Pension Consultants ("APC") which was owned by George Russell. APC was formed September 12, 2002. Forming such corporations and/or LLC's was a routine part of Triche's services with his clients. Russell owned and operated APC until he passed away on December 24, 2007, at which time Wayne Triche was named by a judge of the 19the Judicial District as executor of the succession of George Russell.

### B. Creation of American Pension Consultants ("APC")

As stated, in 2002, Russell communicated with Wayne Triche wanting to expand the Triche and Assc's accounting services to include a feasibility study regarding the business of purchasing Life Settlement Contracts ("LSC's")[1]. Mr. Daryl DeArmond ("DD") was the primary Triche & Associates employee assigned to work with Russell to study the feasibility of this business. The Viaticals and LSC business worked like this: Buyers would find people whose life insurance was in tact but who wanted some money right away for themselves rather than wait to die and someone else received the money. The buyer would purchase such a policy at a rate well below its face value in the hope that the previous owner would die soon enough to cause a profit to the buyer. Of course, if the individual did not die soon enough, the buyer would lose money or be compelled to wait years for any earnings. Triche and Associates' evaluation advised there was feasibility to this business only so long as certain assumptions and parameters, such as interest, acquisition costs,

---

[1] Russell wanted to deal only in LSC's not Viaticals. The reader should know that there are two (2) classifications for life insurance policies that owners sell. One is named a "Viatical." A Viatical is a policy in which the insured has a life expectancy (LE) of twenty-four (24) months or less. The second is named a Life Settlement Contract (LSC's) as to which the insured has an LE greater than twenty-four (24) months. Russell's business model excluded Viaticals because their acquisition costs were too high. His model was limited only to acquiring LSCs, the cost of which is less than Viaticals.

accurate LE's, physician confirmed medical findings, were limited, all of which was calculated on the pricing methodology developed by Russell.

### C. Triche and Associates Relationship with APC

Russell made the decision to move APC forward into the LSC industry. Russell's attorney, David Mancuso, prepared papers forming APC and naming Triche as the initial Member and Agent for service of process. On September 12, 2002, David Mancuso filed those papers with the Louisiana Secretary of State

DeArmond thereafter left his employment with Triche & Associates to work closely with and as consultant to APC and Russell, as well for as other clients. Prior to APC conducting any business with the New Orleans Fire Fighters Pension and Relief Fund ("NOFPRF"), lawyer David Mancuso prepared papers removing Triche both as Member and Agent of APC effective March 1, 2003. Actually filed on March 17, 2003, these papers named both Russell and DeArmond as sole Members of APC and DeArmond as sole Agent. Russell then began the operation of the company.

#### i. APC funding

Russell identified different sources of funding. Russell's initial concept was that APC would serve as a fee-paid consultant for various entities which would own the LSC's and for which APC would facilitate the acquisition management of the LSC's. In this concept, APC would not own the LSC's but APC's client would. As shown below NOFPRF rejected this concept.

Russell's alternative concept was for APC to borrow funds which APC would use to acquire and own the LSC's. In this concept, APC would be the borrower of the funds and would repay the lender, but APC, not the lender, would be the owner of the LSC.

Russell, through former state senator, Mike McCleary ("McCleary"), was introduced to various pension funds McCleary was working for and thought might have an interest in what APC

was offering-APCs representation in considering LSCs as an alternative. McCleary introduced Russell to two (2) pension funds that he was representing. Only one of those NOFPRF requested a formal presentation. McCleary arranged the meeting in New Orleans, La.

### ii.     **The Investment Concept - NOFPRF rejects Russell's initial concept**

McLeary arranged an initial meeting for Russell with NOFPRF to discuss APC acting only a fee-paid consultant. Russell requested that Wayne Triche attend the presentation in the event accounting questions were raised. Russell's proposal and initial concept was that APC would serve as a fee-paid consultant where by APC would facilitate NOFPRF's purchasing of and ownership of the LSC's. Triche later learned from Russell that NOFPRF had rejected this proposal because NOFPRF did not want to invest in the death of the insureds.

Russell said that McCleary later advised that NOFPRF might consider Russell's alternative concept whereby NOFPRF would lend funds to APC and for APC to own the LSC's. This is, in fact, what happened. On March 19, 2003, George Russell, as member of APC, signed a so-called Fully Collateralized Established Interest Rate Promissory Note payable to NOFPRF (hereinafter referred to as the "APC Loan"). As is demonstrated by expert William Caughman's affidavit analysis, this document is at best a promise to pay under Louisiana Law and it fundamentally fails to meet the requirements of a promissory note. Facial deficiencies in the APC Loan are clear, not the least of which is a failure to state any interest rate.

### iii.    **APC Purchases LSC's as Owner**

APC would obtain LSC's from nation-wide brokers/servicing agents such as Portsmith, Vespers, Savanah Financial, and AVS Servicing. These brokers/servicing agents would first "vet" each LSC. This included substantial efforts to secure life expectancy predictions from accredited physicians or the insured's personal physician as well as from Lloyds of London. Russell would

4

evaluate the policies and determine how much he would be willing to pay for the LSC. As to those LSC's APC purchased, APC was named owner in a complicated series of paper work efforts starting with the original insureds, then to the broker, then to APC. The broker would alert APC when the insured died so that APC could collect from the insurance companies. As it turned out, many of these insureds lived far longer than they were predicted to survive.

        iv.        **Payments on the APC Loan**

The facts are clear that NOFPRF had lent APC funds which APC was to use to purchase and be the owner of LSC's. For the first 10 quarters APC made interest payments to NOFPRF. The last quarterly payment was made "October 5, 2005," see indictment page 3, ¶10. No other payment was made for five years, see indictment page 3 ¶10: "On November 10, 2010, payments totaling $500,000 mere made to NOFPRF." This period is beyond the three (3) year prescription and the five (5) year prescription under state law that is discussed hereunder. The APC Note had prescribed. No renunciation of the prescription period is even alleged in the indictment. Nor was there one in fact and truth. A renunciation requires a clear, direct, and absolute and manifested by words or actions of the party in whose favor prescription has run and requires a new promise to pay.

During this period of over five years, George Russell died. December 24, 2007. Wayne Triche was appointed by a judge of the 19th Judicial District to serve as executor of the succession of George Russell bearing the broadest of powers as provided in George Russell's will. Because George Russell owned APC, APC was one of the succession assets. In order to preserve the LSC's that APC owned and to keep alive APC's right to recover on the policies, Succession Of Russell Executor Wayne Triche caused payments on the LSC's to be made to the Life Insurance Companies.

However, due to the fact that there were not payments made by APC to NOPRF on the so-called promissory note from October 2005 through November 2010, this promissory note expired as a matter of Louisiana Law. Thereafter, as fully set forth below NOFPRF had no "property right" in connection with any action on the prescribed promissory note between itself and APC. In spite of the debt having prescribed, Mr. Triche disbursed certain funds to NOFPRF but in neither event nor communication did he on behalf of the Succession of Russell renunciate the prescription that had run in its favor.

The result is unavoidable. None of the payments identified in the indictment as the basis of mail or wire fraud rise form a valid property right. As a matter of law, these counts must be dismissed.

## II. LAW AND ARGUMENT

A wire fraud conviction under 18 U.S.C. § 1343 requires proof of – (1) a scheme to defraud, (2) the use of interstate wire communications in furtherance of the scheme, and (3) a specific intent to defraud. *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir.2015); *United States v. Izydore*, 167 F.3d 213, 219 (5th Cir.1999).

### A. Legal Standard

A criminal defendant may, by pretrial motion, raise an objection to "a defect in the indictment or information, including … failure to state an offense." Fed.R.Crim.P. 12(b)(3)(B)(v). Because a motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment, the court is required to "take the allegations of the indictment as true and to determine whether an offense has been stated." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir.2004). "The test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United*

*States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir.1986). The constitutional sufficiency of an indictment is measured by "whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Ellender*, 947 F.2d 748, 755 (5th Cir.1991).

### B. The APC loan does not satisfy the legal requirements for a Promissory Note and is a Promise

The APC loan- attached hereto as Exhibit "1" has legal deficiencies on its face and does not have the requisite elements to satisfy the requirements for a promissory note under Louisiana law. Under Louisiana Revised Statute 10:3-104, a negotiable instrument is "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." *See* attached Exhibit "2"-Affidavit of William Caughman. La. R.S. 10:3-104 further states that the promise or order must: (1) be payable to bearer or to order at the time it is issued or first comes into possession of a holder; (2) be payable on demand or at a definite time; and (3) not state any other undertaking or instruction by the person promising or order payment to do any act in addition to the payment of money. *Id.* Under La. R.S. 3-108, a promise or order is "payable on demand" if (1) the instrument states that it is payable on or at sight, (2) payable upon the will of the holder of the instrument, or (3) the instrument does not state any time of payment at all. *Id.*

A promise or order is payable at a definite time if the instrument is payable upon the elapse of a definite period of time or at a time readily ascertainable at the time the promise or order is issued. Promissory notes are generally negotiable, a document does not have to be negotiable in order to be a valid promissory note. *Id.* A note is non-negotiable when it contains all of the

7

requirements set forth in La. R.S. 10:3-104 but does not include language that the note is payable to order or to bearer. *See Dixie Web Graphic Corp. v. Sharp*, 619 So. 2d 1173, 1175 (La. App. 1st Cir. 1993).

A promissory note, whether negotiable or non-negotiable, is invalid and unenforceable when it does not include express language evidencing a promise to pay, on demand or at a fixed determinable future time, a sum certain of money, or that has not been signed by the maker. *See Dixie Web Graphic Corp. v. Sharp*, 619 So. 2d 1173, 1175 (La. App. 1st Cir. 1993). The APC Note is invalid and unenforceable. The APC loan does not contain a definitive sum certain of money, but rather includes vague language that the escrow agent will "purchase of at least $5,250,000.00 Senior Settlement Life Insurance Policies" and that the borrower promises to pay NOFPRF at least this amount. *See* attached Exhibit "2".

A promissory note, whether negotiable or non-negotiable, is invalid and unenforceable when it does not include express language evidencing a promise to pay, on demand or at a fixed determinable future time, a sum certain of money, or that has not been signed by the maker. *Dixie Web Graphic Corp. v. Sharp*, 619 So. 2d 1173, 1175 (La. App. 1st Cir. 1993). In *Dixie*, the plaintiff brought suit against the defendant seeking to enforce an alleged promissory note executed by the defendant. At trial, the plaintiff alleged that the defendant owed him a sum of $14,328.48 under a purported (and quite ambiguous) promissory note. *Id*. at 1174. Further, the Plaintiff alleged that even though the document was non-negotiable, the instrument was nevertheless an enforceable note.

In support of his argument, the plaintiff argued to the trial court that the defendant even acknowledged the note in making a one-time payment of $500.00 to the plaintiff. The defendant filed a preemptory exception of no cause of action and the Nineteenth Judicial District Court

8

granted the exception. The court reasoned that the purported promissory note was not an enforceable note because, even though it was signed by both parties, the instrument did not state who was paying whom and therefore the note was unenforceable as written. Ultimately, the trial court held that the note was "vague, ambiguous and without legal effect." *Id.*

On appeal, the plaintiff asserted the trial court erred by not giving effect to the intent of the parties. *Id*. at 1175. The First Circuit analyzed the requirements for a document to be considered an enforceable promissory note. The court stated:

> A document evidencing a debt to be paid may be a negotiable promissory note, a non-negotiable promissory note, or not a note at all. In order for a document to be a negotiable promissory note, it must meet the requirements of LSA-R.S. 10:3-104. These are: (1) signed by the maker or the drawer; (2) contain an unconditional promise or order to pay a sum certain in money; (3) be payable on demand or at a definite time; and (4) be payable to order of bearer. If the document is not payable to order of bearer, yet meets the other requirements of 10:3-104, it is a non-negotiable note. (Citations omitted.)

Finally, if the document does not contain language evidencing a promise to pay, on demand or at a fixed determinable future time a sum certain in money, or is not signed by the maker, it is neither a negotiable nor non-negotiable instrument, and [the note] is invalid and unenforceable. The character of a document is determined by examining the entire writing to see if the requirements of enforceability of a note have been met. (Emphasis added.) *Id.* at 1175. On appeal, the First Circuit held that the note was unenforceable and affirmed the trial court's decision. *Id.*

Based on the foregoing, the APC Loan is invalid and unenforceable. Even though the APC Loan has express language identifying the payee and payor, unlike the contested note in *Dixie*, the *Dixie* holding still favorably applies here because, as emphasized by the First Circuit, a valid note must contain a "sum certain of money." The APC Loan does not contain a definitive sum certain of money, but rather includes vague language that the escrow agent will "purchase of at least -

9

NOFPRF at least this amount. This ambiguous language of the APC Loan is similar to the vague language included in the *Dixie* promissory note. As explained by the *Dixie* court, failure to meet these requirements renders the note invalid and unenforceable. Thus, the APC Loan is invalid and unenforceable because the APC loan fails to identify a "sum certain of money."

### C. The APC Loan is really just a promise to pay

The APC Note is more appropriately characterized as a promise to pay under Louisiana law. As such, an action on this promise to pay must be brought within three years of the last payment or it is extinguished under Louisiana law. *See* La. Civil Code Art. 3494; attached Exhibit "2".

### D. Even if the APC Loan is considered a Promissory Note, it is still unenforceable and has prescribed and Wire Fraud counts are based upon an extinguished oblia

"[T]he prescription by which debts are released is a peremptory and perpetual bar to every species of action, real or personal, when the creditor has been silent a certain time without urging his claim. *Succession of Aurianne*, 219 La. 701, 709; 53 So.2d 901, 903 (1951). An action on a promissory note, whether negotiable or not, is subject to a liberative prescription of five (5) years, which "commences to run from the day payment is exigible." La. Civil Code art. 3498; *see also* La.Civ. Code art. 3447 (defining liberative prescription as "a mode of barring of actions as a result of inaction for a period of time"). In the instant matter, NOFPRF and American Pension Consultants, LLC ("APC") entered into the APC Loan on or around March 19, 2003 ("Promissory Note"). The Indictment alleges that pursuant to the APC Loan,

> … NOFPRF provided $5,000,000 to APC so that APC could purchase life insurance policies. The Promissory Note restricted the use of funds from the NOFPRF to the purchase of life insurance settlements, administrative expenses not to exceed $119,000.00, and a payment to APC of $250,000 at the closing of the loan …. The note was set to run until all life insurance settlements had paid out, or until all life insurance settlements had been sold to third parties. The Promissory

10

>Note called for an annual 9.5% interest payment to be paid to NOFPRF quarterly, with the principal to be paid at the end of the Promissory Note.

Indictment at 1-2, ¶ 2.

Even assuming that the APC Loan can meet the prerequisites, the note has prescribed for non-payment as set forth in the Indictment. Between October 2005 and November 2010, APC did not make any payments to NOFPRF, nor did NOFPRF make any demand on APC for payment. There has been no extension of the prescriptive period for the APC Loan between APC and NOFPRF. *See* La. Civil Code arts. 3447 and 3449 and attached Exhibit "2". Thus, even if the APC is considered a promissory note, it has prescribed and any payments made thereafter do not operate to revive the extinguished obligation. *Id.*

Under Louisiana law, renunciation of prescription must be "clear, direct, and absolute and manifested by words or actions of the party in whose favor prescription has run." *Lima v. Schmidt*, 595 So.2d 624, 631 (La.1992). "[A] mere acknowledgment of an obligation already prescribed is not sufficient to render it enforceable." *Glass v. Holomon*, 197 So. 438, 439 (La. Ct. App.1940). Indeed, a borrower may "acknowledge his debt, and pay part of it, without renouncing the prescription acquired on it." *Baye v. Midland Credit Mgmt., Inc.*, No. 17-CV-4789, 2017 WL 4918998, at *11 (E.D. La. Oct. 31, 2017) (quoting *Succession of Slaughter*, 108 La. 492, 32 So. 379 (La. 1902)). In the instant matter, neither APC nor Triche made any "new and positive promise to pay" NOFPRF as required to renounce the accrued prescription on the Promissory Note. *Succession of De Grange*, 198 So. 784 (La. Ct. App.1940). APC's payments to NOFPRF were not sufficient on their own to render the prescribed Promissory Note enforceable. *See Succession of Slaughter*, 108 La. 492, 32 So. 379 (La. 1902).

Any obligations that Triche had under the APC Loan have been extinguished since any Promissory Note has, in fact, prescribed. *See Merchants Tr. & Sav. Bank v. Don's Int'l, Inc.*, 538 So.2d 1060, 1061 (La. App. 4 Cir.1989) (defendant has the burden of establishing nonexistence or extinguishment of his obligation in a suit for payment on promissory note). When "[an] action is barred by prescription, a natural obligation still subsists, although the civil obligation is extinguished." *Succession of Aurianne*, 219 La. 701, 709; 53 So.2d 901, 903 (1951). Unlike a civil obligation, however, a natural obligation "is not enforceable by judicial action … [and] a contract made for the performance of a natural obligation is onerous." La.Civ. Code art. 1761. As discussed below, the extinguishment of the underlying obligation on the Promissory Note negates any intent to defraud, which is one of the required elements of wire fraud.

### E. The United States cannot allege the requisite "scheme to defraud" based upon the prescribed Promissory Note.

In a wire fraud case premised on a scheme to obtain money or property, "the issue is whether the victims' property rights were affected by the misrepresentations." *United States v. Hoeffner*, 626 F.3d 857, 868 (5th Cir.2010) (quoting *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir.2010)). The Fifth Circuit analyzed this requirement in detail in *United States v. Ratcliff*, in which the Livingston Parish President was charged with mail fraud based upon his alleged scheme to deprive the parish of money and property through misrepresentations, thereby wronging the parish's property rights. 488 F.3d 639, 645 (5th Cir. 2007).[2] The Government alleged that Ratcliff "used the mails in a scheme to defraud Livingston Parish of the salary and employment benefits

---

[2] The United States Supreme Court has found that because the mail and wire fraud statutes share the same language in relevant part, the same analysis applies to each. *United States v. Mills*, 199 F.3d 184, 188 (5th Cir.1999) (referring to *Carpenter v. United States*, 484 U.S. 19 (1987); see also *United States v. Brumley*, 59 F.3d 517, 520 n. 4 (5th Cir.1995)("cases construing the mail fraud statute are applicable to wire fraud"), superseded on other grounds, 116 F.3d 728 (5th Cir.1997).

of elected office through misrepresentations he made to the Board of Ethics concerning the financing of his campaign." *Id.* at 643. Ratcliff filed a motion to dismiss all 14 mail fraud counts, which the district court granted. *Id*. On appeal, the United States argued that Ratcliff's indictment sufficiently charged the offense of mail fraud because the salary and employment benefits of elected office constituted "money or property." *Id*. The Fifth Circuit affirmed the lower court's dismissal of the indictment, finding it "evident that Ratcliff's indictment [did] not allege a scheme to defraud Livingston Parish of any money or property." *Id.* at 645. The *Ratcliff* Court explained:

> Although the charged scheme involves Ratcliff ultimately receiving money from the parish, it cannot be said that the parish would be deprived of this money by means of Ratcliff's misrepresentations …. Indeed, there are no allegations that the parish would be deceived, either directly or indirectly, into taking any action at all; rather, the indictment alleges a scheme to deceive the Board of Ethics and the voters. Though the misrepresentations in a mail fraud scheme need not be made directly to the scheme's victim, the alleged scheme must nevertheless be one to defraud the victim. Ratcliff's indictment provides no basis to find a scheme to defraud Livingston Parish through misrepresentations made to the Board of Ethics. The misrepresentations simply did not implicate the parish's property rights.

*Id.* at 645–46. The Fifth Circuit concluded: "We have not suggested that a mail fraud scheme must actually cause a financial loss to the victim, merely that a scheme to defraud a victim of money or property, if successful, must wrong the victim's property rights in some way … [and] the scheme alleged in the indictment implicates none of Livingston Parish's property rights." *Id.* at 648.

Here, the Indictment alleges that Triche schemed to "obtain money and property" belonging to NOFPRF. *See* Indictment at 3. However, a party cannot assert property rights in a thing as to which prescription has accrued. *See, e.g., Smith v. Tyson*, 193 La. 571; 192 So. 61 (1939); *St. Martin Land Co. v. Pinckney*, 212 La. 605; 33 So.2d 169 (1947); *Mississippi River Transmission Corp. v. Tabor*, 757 F.2d 662 (5th Cir.1985). However, as detailed above, the Promissory Note has prescribed. As such, NOFPRF has no property rights or interests in the

13

Promissory Note or any allegedly unlawful payment, withdrawal, or other transaction arising therefrom. In short, here – as in *Ratcliff* – the "scheme" alleged in the Indictment implicates none of NOFPRF's property rights. *Ratcliff*, 488 F.3d at 648. Since the alleged "victim's" property rights were not – and could not be – affected by the scheme alleged in the Indictment, the United States has failed to charge a "scheme" that could form a basis for wire fraud. *See United States v. Hoeffner*, 626 F.3d 857, 868 (5th Cir.2010).

## III.   CONCLUSION

WHEREFORE, based on the foregoing, Defendant Wayne Triche respectfully requests that this Court grant this Motion to Dismiss Counts 1 – 34 of the Indictment based upon the United States' failure to state an offense.

Respectfully submitted,

/s/ Brian J. Capitelli
BRIAN J. CAPITELLI (LA Bar #27398)
CAPITELLI AND WICKER
1100 Poydras St., Suite 2950
New Orleans, LA 70163
Phone: (504) 582-2425
Fax: (504) 582-2422
brian@capitelliandwicker.com
*Counsel for Defendant Wayne Triche*

/s/ C. Frank Holthaus
C. FRANK HOLTAUS (LA Bar # 6796)
8555 United Plaza Blvd., Suite 200
Baton Rouge, LA 70809
Phone: (225) 706-9273
Fax: (225) 304-4470
frank@holthauslaw.com
*Counsel for Defendant Wayne Triche*

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February, 2020, I electronically filed the foregoing with the Clerk of Court, by using the CM/ECF system, which will send a notice of electronic filing to counsel for the United States.

    /s/ BRIAN J. CAPITELLI
BRIAN J. CAPITELLI